Sangston, *et al.*, Adm'ces *vs.* Hack and Wife, *et al.*

(Decided 20th June, 1879.)

---

GEORGE E. SANGSTON, and ELIZABETH C. SANGSTON and MARY E. SANGSTON, Administratrices of LAWRENCE SANGSTON, deceased *vs.* OLIVER F. HACK and ANNIE H. HACK, his Wife, and others. OLIVER F. HACK and ANNIE H. HACK, his Wife, and others *vs.* GEORGE E. SANGSTON, and ELIZABETH C. SANGSTON and MARY E. SANGSTON, Administratrices of LAWRENCE SANGSTON, deceased.

*What amounts to an Acceptance of Trusts created by a Will—Lapse of time and Laches—Trustees and Cestuis que trust—Continuation of a Partnership after the Time limited by the Articles—Percentage of profits as compensation to a Clerk does not constitute him a Partner—Act which did not prevent the continued operation of Articles of Partnership—Proper basis under the circumstances of the case, for the Statement of an Account as between the Beneficiaries under the Will of a deceased Partner and the Surviving partners—When compensation will be allowed Surviving partners for winding up the Partnership—Obligation of a Partner who fails to comply with his Agreement to furnish Capital, to share proportionately with his Co-partners in the loss of Capital—When surviving Partners are incompetent to Testify in their own behalf.*

Sangston, *et al.*, Adm'ces *vs.* Hack and Wife, *et al.*

Where the same parties are executors and trustees under a will, the fact that they take out letters of administration as executors, amounts to an acceptance of the trusts created and imposed upon them by the will.

Mere lapse of time and laches are not an absolute bar to an account, as between such trustees and the *cestuis que trust*, under the express trusts created by the will.

If a partnership under Articles, for a definite time, is silently continued after that time, the Articles will continue in force as between the partners, except so far as the firm in the after conduct of its business, varies or departs from them, or appears to adopt new ones.

Three brothers, who had entered into a partnership under Articles, for a definite time, agreed in writing, endorsed on the Articles, to continue the partnership for two years, "subject to a charge of twelve *per cent.* of the net profits" to a former clerk, "in lieu of the salary heretofore allowed him." HELD :

1st. That this did not make the clerk a partner, for where a percentage of profits is adopted simply as a mode of measuring the amount of wages, salary or remuneration, the fact that it is made contingent upon profits does not create a partnership.

2nd. That assuming, that he was a partner, and so continued for the two years, his withdrawal at the end of that time did not prevent the continued operation of the Articles as between the three brothers, who afterwards continued the business of the firm.

One of the brothers died in April, 1851, leaving a will, and in August of that year, the two survivors formed a new partnership under the same name, and continued the business for three years when they failed. More than eighteen years after the testator's death, a bill was filed by his children and grand children, beneficiaries under his will, against the surviving partners for an account. HELD :

That under the peculiar circumstances of the case (which are pointed out in the opinion of this Court) the Court below was right in directing the account to be stated from the Cash book and Ledger of the old firm, the only ones still extant, the others after being preserved for a long time, having been sold for waste paper.

No compensation can be allowed surviving partners for winding up the partnership, unless so *stipulated* in the partnership Articles ; but

when such stipulation is made, it must be carried out, and compensation allowed.

Where each partner agrees to contribute a certain sum of money as capital, and the enterprise proves a failure, the partner who has brought in nothing, must make good to his co-partners the proportionate share he agreed to furnish.

Upon a bill for an account by the representatives of a deceased partner against the surviving partners, the latter are not competent witnesses in their own behalf.

. CROSS-APPEALS from the Circuit Court of Baltimore City.

The bill of complaint in this case was filed on the 16th of June, 1869, by Oliver F. Hack and Annie H. Hack, his wife, daughter of James A. Sangston, deceased, Annie E. Hack infant daughter of the said Oliver and Annie, James E. Sangston, son of the deceased James A. Sangston and Laura E. S. Sangston and others, infant children of the said James E. Sangston, against George E. Sangston and Lawrence Sangston. The object of the bill was to obtain an account of the estate of the deceased James A. Sangston, from the defendants who were his surviving partners, executors and devisees in trust, and for other purposes. The defendants answered the bill. Other proceedings were had. Lawrence Sangston having died, his widow and daughter, as his administratrices, were substituted in his place. Finally on the 19th of July, 1878, the Court, (GILMOR, J.,) decreed that there was due to the partnership of Sangston & Co. by Lawrence Sangston, deceased, the sum of $27,260.19, with interest from the date of the decree; and that by the said partnership there was due to the trust estate of James A. Sangston, deceased, the sum of $24,672.19, with like interest, and to George E. Sangston the sum of $9077.25, with like interest, and that for the payment of said sums in their due proportions, the assets of said partnership remaining, and which

were particularly specified, should be sold, and the proceeds brought into Court to be so applied. Trustees were appointed to make such sale. Other provisions of the decree it is not deemed necessary to set out. From this decree, as also from the previous order of the 7th May, 1878, sending the case to the auditor to state an account in conformity with the views expressed in the opinion of the Court directing such reference, both sides appealed.

The cause was argued before BARTOL, C. J., BOWIE, MILLER, ROBINSON and IRVING, J.

*Geo. Hawkins Williams,* for the complainants.

By the death of James A. Sangston, the partnership of which he was a member, was dissolved. If, by implication, the old partnership was supposed to continue, notwithstanding it had expired in the three years by express limitation, and notwithstanding the intermediate existence of the new and distinct partnership with another man—Pollard—which had been substituted and intervened; yet, by the terms of his (Sangston's). will, his capital was to be a loan, " dating from his decease," " for the convenience of that firm," and " not as a continuation of my interest therein," *with no right to profits, nor liability for losses.*

George E. and Lawrence having accepted the office of executors of the will, and all the trusts thereunder, are bound by every line of it; they cannot take anything under a will and dispute anything in it.

The partnership, therefore, in law and fact, was dissolved on 18th April, 1851, the day of James A. Sangston's death.

Accepting the trusts of the will, George and Lawrence became express trustees in three different capacities—as surviving partners, executors, and devisees in trust.

The *cestuis que trust*, or the beneficiaries of the great bulk of the estate, were infants and a married woman.

As trustees, George and Lawrence Sangston were then bound to keep correct accounts, clear, distinct and accurate—and if they did not, all presumptions, all obscurities and doubts are to be taken adversely to them. 2 *Perry on Trusts, sec.* 821; *Blauvelt vs. Ackerman,* 23 *N. J., Equity,* 495; *Bevans vs. Sullivan,* 4 *Gill,* 391.

And if the firm really became insolvent from losses, the same should be specified and the names given of those by whom the same accrued, so that the truth or falsehood of such statements, and the amount of such pretended losses could be verified by evidence competent in law.

The complainants are entitled to one-third of all sales of real and leasehold estate standing in the joint names at the price it sold for. To *all* that the parcels standing in James A. Sangston's name sold for, and to a lien on the warehouse on Baltimore street and the lot on Edwards street; also, to one-third of the value of the stock on hand, and debts recovered, less debts due by the old firm, which defendants shall prove were specifially due by said old firm, and by them actually paid, and a reference to the auditor to ascertain, as far as practicable, such amounts, and if not practicable, then to be stated with all presumptions against those whose conduct makes it impracticable.

The partnership, the Articles of which have been given in evidence, came to an end *absolutely* when the new one was formed, of which Pollard became a member. An incoming new partner makes a new partnership, and is in no sense a continuation of the old. *Story on Partnership, sec.* 307; *Abat vs. Penny,* 19 *Louisiana Ann. Rep.,* 289; *White vs. White,* 5 *Gill,* 377.

When, therefore, Pollard, after two years, went out, the three brothers again *de novo* associated themselves, and commenced a new partnership business by parol. In the

. absence of any proof of the terms ; the law settles the terms.   You cannot bridge the " hiatus " and import into it, as the terms, some few of those of a theretofore existing partnership; for so doing there is no warrant in law, and in this case none in fact.

Lawrence Sangston claims *new* terms; he insists that in the new partnership, he was to be what he was not in the former—an equal partner.   Then if the terms are in any respect new, what authority or justification can there be in adhering to the old terms as to all else ?

In the absence of proof such implications are monstrous, and since the case of *McKaig, et al., Trustees vs. Hebb & Brengle,* 42 *Md.,* 231, it cannot now be urged that George E. and Lawrence Sangston are competent witnesses for the purposes for which they volunteered and came forward.

The Articles, therefore, of the old, defunct partnership expired with it by limitation in 1846, and were "*functi officio.*"

Lawrence Sangston cannot resort to them in part, swell his interest from a fourth to a third, and then comply with nothing else in them.

Were the original partnership books in *esse,* they would not be evidence, unless James A. Sangston, ill and dying in Florida, had had ample opportunity to examine them, against him nor those claiming under him. *Taylor on Evidence, sec.* 786.

And in no event are they evidence, save up to the *close* of the partnership.   If credits are claimed for anything subsequent, then *strict proof* is required.   *Bevans vs. Sullivan,* 4 *Gill,* 391.

If this firm ended on the day of James A. Sangston's death, or at any other time, by his will they had a loan of his capital, but they had no right to take the stock at a valuation, nor in any other manner than by a sale. *Parsons on Partnership,* 446 ; *Lindley on Partnership, (marg.)* 868 ; *Crayshaw vs. Collins,* 15 *Vesey,* 227 ; *Featherstonhaugh vs. Fenwick,* 17 *Vesey,* 309.

The law discountenances all allowances to partners for their trouble in settling up their affairs, and only allows it under special agreement. *Whittle vs. McFarlâne*, 1 *Knapp P. C. Cases*, 312; *Bradford vs. Kimberly*, 3 *Johns. Ch. Rep.*, 431 ; *Beatty vs. Wray*, 19 *Penna.*, 516; *Bevans vs. Sullivan*, 4 *Gill*, 394. But even if commissions be agreed upon under special agreement, they are disallowed where there are no regular accounts or vouchers. *Story's Equity*, sec. 468 ; *White vs. Lady Lincoln,.*8 *Vesey*, 363 ; *Lupton vs. White*, 15 *Vesey*, 441. For a mere questionable manner in keeping accounts they were disallowed in *Blauvelt vs. Ackerman*, 23 *N. S. Equity*, 504.

In this case the Articles of an old defunct partnership, even if by implication imported into the new firm, only allow a compensation to survivors "for *closing* the business."

Upon a decree for an account, answer no evidence of disbursements. *Boardman vs. Jackson*, 2 *Ball & B.*, 382; *Gibson vs. McCormick*, 10 *G. & J.*, 65 ; *McNeal vs. Glenn*, 4 *Md.*, 97.

The accounts furnished are admissible as evidence against them, and using them is no admission of their correctness ; they must prove the credits they claim. *Morehouse vs. Newton*, 3 *De Gex & Sm.*, 307.

As to limitations and *laches*, these do not apply to express trusts, nor can married women and infants be guilty of them to their trustees. Besides, they are not construed so strictly to apply between relatives. 2 *Story's Equity*, sec. 1520, *d.* And there can be no acquiescence ever without knowledge. *Pairo vs. Vickery*, 37 *Md.*, 486.

*Bernard Carter* and *I. Nevett Steele*, for the respondents.

George E. and Lawrence Sangston, as surviving partners of the firm of Sangston & Co., No. 1, (of which firm James A. Sangston was the other member,) are entitled

to commissions by way of compensation for their services in winding up the business of said firm, upon its dissolution in August, 1851, by the death in April, 1851, of James A. Sangston. This the complainants, as the representatives of James A. Sangston deny.

This claim of respondents Judge PINKNEY (who sat during all the proceedings in the case, except when the case was last heard,) *allowed.* See *Story on Part., sec.* 279 ; *Lindley on Part.,* 697 ; *Parsons on Part.,* 239 ; *United States Bank vs. Binney,* 5 *Mason C. C. Reps.,* 176, 185 ; *Bradley vs. Chamberlin,* 16 *Verm.,* 613.

The claim was rejected by Judge GILMOR.

The amount allowed, was $30,770.35 ; yet of this, only $14,378.67 was principal, the other $16,392.08 being interest from March 1st, 1853, to March 1st, 1872, the date of stating the account.

But it is to be remembered that interest is charged *against* respondents in all the other schedules and accounts stated by the auditor, on all moneys received by them ; so that in considering the question of this compensation we are really only to consider the *principal* of the amount allowed, which is only $14,378.67, as if interest is to be struck off when allowed *to* us, it must be when allowed against us. The $14,378.67 is arrived at by allowing five per cent. on $287,573.61, which was the amount of the indebtedness of the old firm paid by respondents.

This sum of five per cent. was allowed on the amount of the indebtedness of the firm of Sangston & Co., *all of which* was paid by Geo. E. and Lawrence, and to pay which they had expended *of their own money,* up to August 1st, 1854, $47,180.60, and on which account though somewhat reduced by subsequent collections, there is still due to them; as of March, 1872, $41,614.76.

That this is a reasonable amount is proved by three intelligent merchants. The complainants offered no evidence that the amount named was unreasonable.

Are the respondents entitled to compensation?

Their right to it rests upon the express provisions of the Articles of partnership. Having provided that the rate should be fixed by three disinterested persons, the respondents asked the Court to appoint these, but it appears the Court declined to do so, and accordingly the respondents asked three disinterested merchants, to fix what in their judgment was fair, and they did so. But even if this ascertainment is not binding as made, yet being declared by them to be a fair award, this, in the absence of all evidence to the contrary, is sufficient.

Though there is no *written* evidence binding on James A. Sangston, that the original Articles of August 1st, 1843, were continued in force longer than August 1st, 1848, yet, as the partnership was continued without interruption after that period, and was in existence when James died, without any evidence of any change in the Articles, they are to be considered in force.

The firm of Sangston & Co. was *insolvent* as far back as 1848, though the Sangstons did not know it.

The surviving partners paid all its debts, and the books show it to have been insolvent, because George E. and Lawrence, after applying all the assets to the debts, had to expend over $47,000 of their own money. There is not a particle of evidence that the failure to make its assets pay its debts was owing to mismanagement. There is not any evidence that a single dollar of the funds of the firm was misappropriated.

The stock of the firm was taken by the surviving partners at an appraisement made by intelligent merchants. The amount allowed was a very liberal one.

Was the sum of $41,614.76, allowed to respondents, correctly allowed to them? This is the amount, with interest, which appears from the books of Sangston & Co., No. 2, to be the balance due to respondents, for debts of said firm paid by them after the dissolution of said

firm.   It was allowed by both of the Judges in passing
on their accounts.

The opinion accompanying the decree of the 15th of
January, 1872, for account, expressly required the accounts
to be taken from the books of the partnership.

The Court was clearly correct in saying the *laches* of
the complainants had closed their mouths to object to
these books.

In 1854, when they filed their petition to the Orphans'
Court, when all the books were in existence, and all wit-
nesses who made the entries were alive, the respondents
offered every opportunity for full examination.   The books
were actually examined by James E. Sangston, one of the
complainants, the son of James A., who had kept them
in part.

The entries are also affirmatively shown to be correct
by Lawrence Sangston snd George E. Sangston.

What books (being only the Day-book and Journal,)
are not in existence, are shown to have been sold long
after the respondents had reason to suppose that there
was no pretence that there was to be any further claim
made against them, having by their answer in the Or-
phans' Court, in 1854, declared that there was nothing
due to the complainants, and no claim being ever after-
wards made till the books had been sold.

But the books *preserved* contained every entry for the
making of the account, that is, the Ledger and Cash-book.
The only purpose the others would have served would
have been to give more *detailed* items.

But even if the books were thrown out, and we could
only claim such debts as we could prove *aliunde* that we
paid, we have proved enough to make in our favor a still
larger indebtedness.

It appeared by schedule 10, and as brought down to a
later period, September 1st, 1875, by schedule 10½, that
there is due to respondents, called in these schedules

"Sangston & Co., No. 2," a balance of $43,687.79, by the old firm of Sangston & Co., called Sangston & Co., No. 1.

This balance is obtained by crediting respondents with the $41,614.76, due for debts of said firm paid by them, and with the $30,770.35, on account of commissions, and charging them with all moneys received by them for the partnership assets, including the rents, &c. of the Baltimore street warehouse, and interest on all such sums.

We thus have the firm of Sangston & Co., No. 1, indebted to the respondents in the sum of $43,687.79, as of September 1st, 1875. The amount would be of course subject to change now, owing to receipts of rents since on the one side, and interest chargeable on the other side.

The firm of Sangston & Co., No. 1, (the old firm, of which James A. Sangston was a partner) being insolvent to this amount, and being *indebted* in this amount to the respondents, the *assets* of the firm are to be applied in the first instance to the payment of this indebtedness, and is not to be applied to the returning of the partners their *capital.*

The only *existing assets* of the partnership at this time (independent of any debt due by any partner to the concern) are the Baltimore street warehouse, and a small house on Edward street, which was taken in payment of a debt due to the partnership.

No proper and complete partnership accounts can be stated until these assets have been reduced to *money*, so that their real value can be known. There is *no debt* due by said firm (" Sangston & Co., No.1,") to any one, except the aforesaid debt to respondents.

The broad controlling principle which should regulate the mode of stating the accounts in this, as in all partnership cases, is that the assets of the firm are to be applied in the first instance to the payment of the debts of the firm; and no account as between the partners is to be taken till this shall have been done.

Guided by this principle, we contend that the existing assets are to be appropriated to the debt due to the respondents, and when they shall have been so applied, and the balance which will remain unsatisfied from this source ascertained, that then the amount in which each partner may be found to be indebted to the firm for sums drawn in excess of his share, is to be ascertained and made applicable to pay said balance due to respondents. *Story on Partnership*, 348, (A.) Nor until the debts are paid can any of the assets be applied to returning to the partners the capital advanced by them. See 1 *Lindley on Part.*, 790, 791, 798, 807, 827; *Story on Part.*, 348, (a); *Wood vs. Scoles*, 1 *Chancery Appeal Cases*, 369.

Guided by this principle, it is plain that the assets, (the Baltimore street and Edward street houses,) must be sold, and their proceeds applied, in the first place, to the payment of the $43,687.79, or whatever shall be the exact amount as found at the date of the decree to be due to respondents on the account aforesaid.

The auditor, instead of proceeding on this principle, in his schedules subsequent to 10½, has treated the partners as entitled to have their *capital* re-paid to them, *pari passu* with the payment of the $43,687.79 *advanced* by respondents.

The consequence of this mode of dealing with the accounts is, that by the final schedule, (15½) Lawrence Sangston, who is shown by schedule 10½ to be a *creditor* to amount of half of $43,687.79, ($21,843.89,) not only gets none of this, but is actually made to *owe* the concern, $24,308.00; while George Sangston, his co-respondent, who contributed no more of the $41,614.76 advanced by them jointly to pay the debts of the firm, than did Lawrence, and was entitled to no more of the $30,770 allowed for commissions, instead of being made to *owe* the concern, has $12,029 carried to his *credit* in schedule 15½. And James A. Sangston, who earned no commissions, and

advanced nothing to pay the debts of the firm, gets $12,239 carried to his credit. Certainly such a result is its own refutation. By this mode of stating the accounts, we have two partners in an *insolvent* concern, getting back, on account of their capital, over $12,000 each, and leaving the debts unpaid, and bringing the partner who paid the debts in debt to them, in the aggregate as much as they get awarded to them.

There is another very grave error in the principle on which the schedules containing the statement of the capital accounts are made up. The error consists in allowing interest on the amount of capital found credited on the books of Sangston & Co., No. 1, to the two partners, James A. Sangston and George E. Sangston.

Interest is allowed for 19 years, 28 days prior to March 1st, 1872, that is from February 1st, 1853, making an aggregate of $54,132.61 allowance for *interest* on capital found credited on the books to these two partners.

If this item of $54,132.61, allowed for interest on capital stock be struck out, a difference will be made in the result of the accounts. If we look at schedule No. 16, as ratified by the Court, it will be seen that James A. Sangston's account is credited with $61,363.76 on capital account; whereas, without interest, it would only be one-half of $47,298.61, or $23,649.30, thus showing a difference in his credit of $37,716.66 ; this (although his debits would not be so large either, if the correction as to interest be made,) would entirely wipe out the whole amount decreed to be due his estate. The same consequence would result to George E. Sangston.

It will thus be seen that the decree against the estate of Lawrence Sangston would have been largely in his favor, if interest had not been allowed upon the alleged capital of James A. Sangston and George E. Sangston from the year 1854. This allowance of interest was not a matter of right, but was to be made, if at all, only in

case the Court, upon consideration of all the equities of
the case, decreed it just and proper. Such allowance is
not equitable in this case, or justified by the facts. The
defendants have had no balance of money in their hands;
they have been guilty of no fraud, but honestly settled up
the partnership affairs; those affairs, to say the least of
it, difficult, and of doubtful result; and, under these cir-
cumstances, the adult complainants, who are entitled to
the interest, if it be allowed, were guilty of gross laches
in not taking steps to obtain an authoritative ascertain-
ment of their rights.

It is believed no case can be found, in which, under
such circumstances, a Court of Equity has allowed inte-
rest upon the capital of a partner. Certainly, it would
seem, that if allowed at all prior to the actual setttlement
of the account, it should not be allowed before the filing
of the bill. 1 *Lindley on Part.*, 807, *et seq.; Watney vs.
Wells*, 2 *Chan. Appeals, L. R.*, 250; *Gyger's Appeal*, 62
*Penn.*, 80; *Bowling vs. Dobyn*, 4 *Dana*, 438; *Passenger
Railway vs. Sewell*, 37 *Md.*, 452; *Trump vs. Baltzell*, 3
*Md.*, 295; *Raynor vs. Bryson*, 29 *Md.*, 473; *Gott vs. State,
use of Barnard*, 44 *Md.*, 320,321; ―――― *vs. Loughborough*,
8 *Chan. Appeals, L. R.* 1; *In re The German Mining
Co.*, 19 *Eng. L. & Eq.*, 591.

By the true construction of the Articles of partnership,
the capital of James and George was, as between the
partners, to be exhausted before there was to be any divi-
sion of losses among the parties personally; and it was
no part of the design of said Articles that Lawrence
should be held to contribute to make good this capital.
He does not stipulate positively to put in any capital, but
only such as he might be able to get together from the
assets of the firm of Sangston, Whiteley & Co., of which
he had been a member. It does not appear anywhere that
he ever realized anything from this source, and was there-
fore in no way in default.

It appears from schedule No. 6, that James A. Sangston's estate owes to the firm $5247.91 up to March 1st, 1872, (more since, on account of interest,) for moneys paid to the complainants by the respondents since the death of James. These sums were paid for their support, at a time when it was supposed that the affairs of the firm would wind up differently. This sum is therefore applicable to pay Lawrence and George any deficiency that may exist in the amount due to them as creditors of the estate, after the application of the proceeds of the sale of the property now constituting partnership assets. *Story on Partnership*, 348, (*a.*)

MILLER, J., delivered the opinion of the Court.

By the will of James A. Sangston, who died in April, 1851, the testator appointed his brothers, George E. Sangston and Lawrence Sangston, his executors, and directed them to invest and hold all his estate in trust for the benefit of his two children, with certain limitations over in favor principally of his grandchildren. The executors took out letters of administration upon his estate, and thereby accepted the trusts created and imposed upon them by the will. *Hanson and Wife vs. Worthington,* 12 *Md.,* 418. They then returned to the Orphans' Court an inventory of the personal property, consisting chiefly of household furniture, appraised at $1622.85, and the inventory then states that: " In addition to the above the deceased had an interest in the firm of Sangston & Co., not ascertained '' At the time of the death of the testator, and since the 1st of August, 1843, the three brothers, James, George and Lawrence, were and had been partners in the commercial firm of Sangston & Co., which carried on the wholesale dry goods business in the City of Baltimore. All the estate of the testator seems to have consisted of the furniture above mentioned and his interest in the partnership property, real and personal, belonging to

this firm. The estate was never settled up by the executors in the Orphans' Court, and on the 16th of June, 1869, more than eighteen years after the testator's death, the bill in this case was filed by his two children and his grandchildren, beneficiaries under his will, against these executors and trustees for an account. It is not necessary to state at length the averments of this bill or of the answer thereto. Nor shall we stop now to consider and notice in detail the proceedings in the cause prior to the decree for an account. It is sufficient to say that lapse of time and *laches* have not been relied on in the argument before us, and, in view of the relation in which the parties stood to each other, could not be relied on as an absolute bar to the accounting. The liability to account was conceded by the defendants' counsel, and the whole difficulty in the case relates to the ascertainment by the account of the testator's interest in this firm. And as to this many questions have arisen and have been argued with great earnestness and ability. The record is quite voluminous and yet it does not contain some of the exhibits, balance sheets and statements referred to by the witnesses, which might have aided us in reaching proper conclusions on many of the minor points presented by the numerous exceptions taken by both parties to the auditor's accounts. Again the auditor, instead of stating the accounts in the mode usually adopted in equity cases, and with which the Court is familiar, has reached results by a series of schedules or accounts, made out in the mode and on the principles adopted by professional and expert book-keeping accountants, and this we have found has not diminished the labor attending our investigations. These difficulties were suggested to counsel during the argument, and they then expressed the desire that we should confine ourselves to the decision of certain prominent and controlling questions, and assured us that when these were decided it would not be difficult to re-state the accounts and adjust

the rights and liabilities of the parties. But apart from this request and assent of counsel, a careful examination of the record has convinced us that this is the only satisfactory mode of now dealing with the case, and we shall accordingly so dispose of it.

1st. The question first in order, if not in importance, is, were the "*Partnership Articles,*" under which the partnership between these three brothers was originally formed, in force at the death of James, in 1851? These Articles were signed on the 1st of August, 1843, and by their terms the co-partnership thus formed was to continue for the term of three years, unless sooner dissolved by mutual consent. At the expiration of this period, viz., on the 1st of August, 1846, the same three parties by an agreement in writing appended to the articles, agreed "to continue the *aforegoing co-partnership* for two years from this date, subject to a charge of twelve per cent. of the net profits to Isaac J. Pollard, in lieu of the salary heretofore allowed him." It is very plain that by this agreement the partnership *under the Articles* was expressly continued for two years. At the expiration of this period Pollard left, and the partnership was continued and the business conducted by the three brothers until the death of James, a period of nearly three years, without any further written agreement between them. This is not an unusual occurrence. It frequently happens that a partnership formed under Articles and limited as to time is silently continued after the expiration of the period originally prescribed for its duration, and the business is carried on by the same parties in much the same way with no new Articles and no formal renewal of the old ones. The question then arises under what terms does the law regard the continued partnership to be conducted? "This question," says Judge STORY (*Story on Partnership, sec.* 279) "does not perhaps admit of any uniform or universal answer. It may be affected by various considerations; by

the acts of the parties; by the habits and changes of their business; by implications from their omission to act upon certain terms of the original contract and from apparent qualification and exceptions and restrictions of others, in their dealings and settlements with each other or even with third persons. But in the absence of all acts and circumstances whatsoever to control or vary the original terms, the just legal conclusion seems to be, that the partnership is to be treated as a mere partnership during the joint will and pleasure of all the parties, and therefore dissoluble at the will of any one of them, but that in all other respects it is to be carried on upon the original terms thereof as to rights, duties, interest, liabilities, and shares of the profits and losses." And in another part of the same treatise (*secs.* 197, 198,) where the effect of the continuation of a partnership, after the expiration of the original term, without new Articles, is also considered, it is said, "the habits of the trade, and the conduct of the parties may often establish the fact satisfactorily, that some of the Articles have been practically waived, or abrogated, or qualified, while others are necessarily implied as being in full force and operation. In such cases the presumption of the actual state of the partnership contract will necessarily vary with the circumstances, and be governed by them and not govern them." In *Parsons on Partnership*, 239, 240, the learned author in treating of the same question, says the answer to it "must depend mainly on the conduct of the parties. If they go on precisely as before, or in such a way as to indicate no intentional departure from such a course, the former Articles would have much influence in determining the terms of their present association, and probably their provisions would be held to be those of the present partnership excepting such, if any there were, as were plainly inapplicable to the present state of things. On the other hand, if the firm varied, or departed from these provisions,

or appeared to adopt new ones, they would be considered as making *so far* a different bargain from the old one," but he adds that the renewal of the limitation of time will seldom be presumed from acts or sustained by the law as part of the new bargain on any thing less than proof that the parties had expressly so agreed. The same general rule is also to be found in most of the text books on the Law of Partnership, and it is very clearly and succinctly stated in *Lindley on Partnership*, 678, thus: " If a partnership originally entered into for a definite time is continued after the expiration of that time without any new agreement, the Articles under which the partnership was first carried on, continue, so far as they are applicable to a partnership at will, to regulate the rights and obligations of the partners *inter se.*" The authorities which these authors cite as establishing the doctrine clearly sustain it, though the instances in which the question has been directly presented for adjudication are comparatively few. The cases in which it has been most clearly recognized or expressly determined are *Crayshaw vs. Collins*, 15 *Ves.*, 228 ; *Booth vs. Parks*, 1 *Molloy*, 466 ; *United States Bank vs. Binney*, 5 *Mason*, 185 ; *Mifflin vs. Smith*, 17 *Sergt. & Rawle*, 165, and *Bradley vs. Chamberlin*, 16 *Verm.*, 613. The rule as thus stated is not only a convenient, but an equitable and reasonable one, and in our judgment its application, for the purposes of justice in this case, is almost indispensable. It must, therefore, be applied, unless some well founded and unanswerable objection is encountered.

The complainants' counsel has argued that the doctrine applies only in cases where one and the same firm has been continued by the same partners, and that here the intervention of Pollard in 1846 made a new firm, which was dissolved by his retirement in 1848, and that the firm thereafter continued was also in law a new firm. In other words the argument is, that the continuity of the original partnership was broken by a succession of new

firms, and therefore the presumption of the continuance of the partnership Articles fails.   It is however a matter of great doubt whether Pollard ever became a partner with the Sangstons.   The question relates of course to a partnership *inter sese* and not as to third parties.   It is often very difficult to decide whether two or more persons are partners as to each other.   The rule is that it is a matter to be determined by the intention of the parties as the same is expressed in the words of their contract, or to be gathered from their acts and all the circumstances which are available for the interpretation of the contract.   *Parsons on Part.*, 58; *Potter vs. Kerr,* 6 *Gill,* 404 ; *Bull vs. Schuberth*, 2 *Md.*, 38.   Previous to the 1st of August, 1846, Pollard had been a clerk in the employ of the firm, and he did not sign the agreement of that date as he naturally would if the purpose had been to admit him as a partner. The Sangstons alone sign it and they thereby agree to continue the previous partnership for two years, "*subject* to a charge of twelve per cent. of the net profits to Pollard in *lieu of the salary heretofore allowed him.*"   This plainly means that instead of the fixed salary which they had before allowed him for his services as clerk, the Sangstons, whilst continuing their own partnership, agreed that Pollard should for two years receive twelve per cent. of the net profits of the business, as compensation for his services during that period.   It is very clear that this did not make him a partner, for where a per centage of profits is adopted simply as a mode of measuring the amount of wages, salary or remuneration, the fact that it is made contingent upon profits does not create a partnership.   *Lindley on Part.*, 15.   In the case of *Bull vs. Schuberth*, (2 *Md.*, 56,) this Court held that the mere fact that remuneration was to depend on the contingency of profits, does not of itself create a partnership, because that is not an uncommon mode of paying agents and servants, and in *Crawford vs. Austin*, 34 *Md.*, 49, it was decided that an agreement by

a firm to pay a party one-third of the profits of the business, as compensation for his services as a salesman did not make him a partner. Nor is the case helped by the agreement dated the 17th of April, 1851, endorsed on the Articles and signed by George and Lawrence Sangston, for that simply recites that Pollard's interest of twelve per cent. had ceased by his withdrawal on the 1st of August, 1848, and that the parties signing had on that day purchased that interest, which means that they had paid or settled with him for his twelve per cent. of the net profits during the two years. There would be no difficulty in holding that he was not a partner, were it not for the admission in the answer (which however is by no means explicit on the subject,) and the testimony of Pollard himself which was introduced by the defendants, and in which he says he was a partner. But assuming that this admission and testimony are sufficient to warrant a different construction of the contract, we are still of opinion that his connection with the firm under the circumstances stated, did not prevent the continued operation of the partnership Articles as between the Sangstons after his withdrawal. We have found no authority to that effect, and we are not disposed to make a precedent in that direction.

Again, a clause in the will of James A. Sangston which was executed in December, 1849, is relied on to show that *he* did not then regard the Articles as in force. One of the conditions of the Articles is, that if either of the parties should die before the first of February or of August, the partnership should continue until the first days of those months respectively, as the case might be, when the business shall cease, and the survivors shall then have the privilege of taking the stock of goods then on hand at an appraisement to be made by duly sworn appraisers, and to continue the business on their own account. A provision like this for the continuance of the partnership after

the death of a partner for a short period until the close of
the respective business seasons of the year, is neither un-
reasonable nor unusual in partnership Articles. The
agreement of the 17th of April, which was evidently
made by the surviving partners after the death of James
in that month, seems to have been executed by them for
the very purpose of carrying out this condition and pro-
viding for a continuance of the partnership under the
Articles until the 1st of August following. By his will
the testator directs that for *three years* after, and dating
from his decease, his portion of the *capital* should remain
in the firm, the surviving partners paying him interest for
the use thereof, and at the end of these three years, the
principal to be paid to his executors, and he adds that he
does this for the convenience of the firm and not as a con-
tinuation of his interest or share therein, or as entitling
his heirs or representatives to a participation in the profits,
or as subjecting them to liability for losses *during that time.*
Now we cannot think that in thus allowing his surviving
brothers and partners the use of his capital for three
years, he had in view or intended to interfere with the con-
tinuance of the partnership for the short period after his
death provided for in the Articles. The whole scope and
tenor of this clause of the will as well as the purpose it
was manifestly intended to subserve could be gratified
without interfering with this condition of the Articles,
and in our opinion it does not show that the testator sup-
posed when he wrote it that the Articles were no longer
in force. Another condition of the Articles is that the
profits should be divided in the proportion of three-eighths
each to James and George, and one-fourth to Lawrence.
The answers aver that on the 1st of August, 1848, this
condition was by verbal agreement between them changed
so that the three should be placed on equal terms as co-
partners, and this averment seems to be supported by the
testimony in the case independent of that of Lawrence

Sangston himself. Changed in this respect only, we are of opinion the Articles were in force at the death of the testator, and we accordingly so adjudge and determine.

2nd. On the 1st of August, 1851, the defendants, the surviving partners, formed a new co-partnership, under the same name of Sangston & Co., and continued in business for nearly three years when they failed. The proof, however, shows that they have paid all the partnership debts of the old firm, and the next question to be decided is, was the Circuit Court right in directing the account to be stated "from the books still extant"? By this we understand the Court as referring principally to the Cash-Book and Ledger D, which have been laid before us, and used in the argument. The first is a book of original entries, commencing in January, 1851, but the Ledger (which also contains entries prior to April, 1851,) of course is not of that character, and both of them contain entries relating to the settlement of the business of the old firm made after the death of James Sangston. But notwithstanding this, we are of opinion, from considerations pertaining exclusively to the circumstances of this case, there was no error in allowing these books to be used in stating the account, and we shall now state briefly, some of the principal reasons that have led us to this conclusion. It is averred by the defendants that all the other books relating to the business of the old firm prior to the death of the deceased partner, consisting of the usual books of an extensive mercantile house, were, after having been preserved for a long time, sold in 1865, by Lawrence Sangston as waste paper. This averment is supported as well as could be expected, without resort to the direct evidence on the subject of Lawrence Sangston himself, by the testimony of the witness Berger, who says he was at that time engaged in buying old books for paper manufacturers, and bought from Lawrence Sangston about one thousand pounds of such books, and made similar purchases from

various other merchants.   We find nothing in the record
to justify the inference that these books were thus disposed
of for the fraudulent purpose of destroying them as evi-
dence against the defendants.   In July, 1854, shortly after
the failure of the new firm, a petition was filed in the
Orphans' Court by the testator's son, (one of the present
complainants,) who was then of full age, and by Mrs.
Hack, the testator's daughter, through her husband, who,
as the record shows, was then a practicing lawyer diligent
and active in protecting the interest of his wife and chil-
dren, calling upon the defendants as executors for a state-
ment of the then unascertained interest of their father in
the old firm.   This was promptly met by an answer from
the defendants in which they allege in substance, that the
old firm was actually insolvent, and that their own failure
was caused by their efforts to pay the large indebtedness
of that firm, and that upon the final winding up of its
affairs the interest of the testator's estate therein would
amount to nothing.   After this petition and answer no
further proceedings were taken either in that Court or a
Court of equity until the filing af this bill, a period of
nearly fifteen years.   This son of the testator was in the
employ of the old firm as assistant book-keeper at the time
of his father's death, and continued with the new firm in
the same capacity for some time thereafter, and in his testi-
mony he admits that after the new firm failed, he with his
uncle George made a cursory examination, lasting some two
or three hours, of his father's affairs, and in that examina-
tion his uncle showed him a list of bad debts and losses the
bulk of which happened in his father's life-time, and of
which witness was himself conversant, and that in the
examination of the books then made, they went over these
debts and losses.   It is also clearly shown that for many
years thereafter the same party had ample opportunity, if
he had chosen to avail himself of it, to make a further and
full and thorough examination of these books, but as it

appears no such examination was ever made. While this long lapse of time, and laches and negligence on the part of the complainants, are not, as we have said, an absolute bar to the account prayed by this bill, they must have weight in considering the complaints now made as to the destruction of the other books, and must have a potent influence in determining the question whether the books now before us ought to be used in stating that account. But more important than all this, it is clearly proved, wholly apart from the books, and the answers, and the testimony of Lawrence Sangston, that the old firm was *actually insolvent* when James Sangston died. That fact is established by the testimony of Pollard, and the complainants themselves have confirmed it by the introduction in evidence of the letter of the defendants to Mr. Hack of the 24th of June, 1854, in which that insolvency is very explicitly asserted. If then, these books are not to be used what basis is there for an account that would be of any benefit to the complainants? We have carefully examined the record and can find none. In face of the proved fact that the firm was insolvent when the testator died, we do not see what account could be stated beneficial to the complainants without recourse to these books and the terms of the partnership Articles regulating the liability of the partners for the capital advanced. Of course we are not to be understood as intimating that a trustee, executor or surviving partner can take charge of a trust estate, and in its administration preserve no vouchers of his disbursements, and yet discharge himself simply by entries made by himself in his own books after the trust commenced. In such case the salutary and just rule is to hold the delinquent party to the strictest proof as to disbursements, and the most rigid accountability, where-ever the amount of the estate committed to his charge is once admitted or ascertained. But in this case the difficulty lies in ascertaining the cardinal fact whether any trust

estate whatever, as respects the interest of the testator in this firm, came to the hands of these defendants as his executors. It seems to us that this fact cannot be ascertained without resort to these books and the partnership Articles. Their use has, in our opinion, become an absolute necessity for the complainants themselves, and is imperatively demanded by the peculiar circumstances of this case. Without them, nothing in the likeness of justice, could be meted out to the parties on either side.

While the books may be thus used, it is of course open to the complainants to controvert any of the items therein. That has been successfully done, as to the charge of $6000 against James Sangston, made as of the 31st of August, 1854, and that item was very properly abandoned by the defendants, and does not appear in the auditor's accounts. But we agree with the Court below, that it is sufficiently shown that the appraisement of the stock of goods on hand, on the first of Augnst, 1851, was made in compliance with the provision of the partnership Articles on that subject, and we are also of opinion that the item of $23,483.40, credited to the old firm in the account between that firm and the new firm, found in Ledger D, represents the amount of such appraisement.

3rd. The next question is, were the defendants, as surviving partners, entitled to compensation for their services in winding up the concerns of the old partnership? That such compensation cannot be allowed, unless it be specially so stipulated, is familiar and elementary law. *Story on Part.*, *sec.* 331. But in this case, the partnership Articles expressly provide that the surviving partners "shall be allowed a reasonable compensation for closing the business, said compensation to be fixed by the Orphans' Court, or by three disinterested persons." By the terms "closing the business," we understand the parties to mean the settlement up of the partnership affairs, or in other words, the collection of its assets, and the application of them to

the payment of its debts. That this was done by the defendants we have no doubt, and the fact that while doing it, they formed a new partnership, and continued the same business at the same place, as the Articles contemplated or permitted, furnishes no good reason why they should be deprived of the benefit which this express stipulation gave them. It would be peculiarly unjust so to do, if in their efforts to pay all the debts of the old firm the defendants devoted, as it appears they did, a portion of their own means to the purpose, and thereby brought about their own financial failure and ruin. The mode of ascertaining the compensation prescribed in the Articles, cannot now be carried out, and the only way in which a Court of equity can arrive at it is by receiving the testimony of witnesses as to what, in their judgment, the services rendered were worth. That was done in the Court below, but the circumstances under which the testimony of the three witnesses on that subject was given, are such that the complainants ought not to be precluded from examining witnesses on their side, and when the cause is remanded that privilege must be allowed them. We are also of opinion that in the adjustment of this compensation no commission, or percentage should be allowed on the amount advanced by the defendants to pay debts. Such services are not within the terms of the Articles, and if in the accounting the defendants are allowed the sum so advanced, with interest, it is all they are entitled to on that score.

4th. The next question relates to the statement of the capital account and the rights and liabilities *inter sese* of the several partners, in respect to the capital advanced by each. We think it clear that this question must be settled by the terms and provisions of the partnership Articles. By those Articles it was agreed that James and George should bring in capital coming from a certain source to an amount not to exceed the sum of $30,000

each, for which they were " to be allowed interest at the rate of six per cent. per annum from the time it is paid in," and that Lawrence should bring in, as soon as realized, all his means and interest in a certain other firm, " to bear a like interest of six per cent." There was actually brought in by James and George the sum of $47,298.61, each contributing an equal part thereof, but it is conceded that nothing was ever brought in by Lawrence. This, therefore, is not the case of a partnership in which it is agreed that one partner shall contribute his services, labor, or skill as against the capital of the others, but the usual case in which each agrees to contribute and put at the risk of profit or loss, money as capital. In such a case where the enterprise proves a failure, and the capital is lost and absorbed by debts, it is equitable and just that the partner who has failed to comply with his engagement, and has brought in nothing, should make good to his co-partners the proportionate share he agreed to furnish, or in other words, should be made to share equally with them in the loss of capital. We have been referred to no authority, and have found none in which a different doctrine has been announced. Then as to the allowance of interest on the capital contributed by James and George. That too we think is covered by the terms of the Articles. It is to bear interest from the time it is paid in, and in our opinion the defendants have no good ground of complaint as to the period for which interest has been calculated by the auditor in the statement of the capital account.

5th. The amount appearing in the auditor's schedules as having been *advanced* by the defendants out of their own means to pay the debts of the old firm, is derived from the account, found in Ledger D, between that firm and the new one. Some of the items of disbursements in the latter part of this account were made at so late a period after the dissolution of the old firm by the death of James

A. Sangston, as to give rise to a reasonable doubt whether they could have been on account of the debts of that firm. We shall, therefore, leave the question of amount open for further investigation, and further proof on the part of the complainants, if they may have any to adduce. But whatever this amount when definitely ascertained may be, we entirely agree with the defendants' counsel that the accounts must provide for its payment with interest, out of the remaining assets of the old firm before the capital is taken care of. These assets consist of the warehouse on Baltimore street, and the house and lot on Edward street. The decree directs them to be sold, and we are of opinion this sale should be made before the accounts are finally stated, for by so doing the amount of such assets will be definitely ascertained and the adjustment of the accounts will thereby be greatly facilitated.

6th. In considering the case we have not relied upon the testimony of either of the defendants, and we are satisfied the objection to their competency as witnesses is well taken. It is sufficiently sustained by the decision in *McKaig vs. Hebb, et al.,* 42 *Md.,* 227.

We have thus disposed of the leading and most important questions in the case, and shall add but a word upon another point. It was alleged in argument that in the auditor's schedules interest has in some cases been compounded. But it is answered that as this has been done on both sides no harm has resulted. All that we propose to say on this question is, that in the re-adjustment of the accounts to be hereafter made, no compounding of interest or calculation of it by rests should be made to the prejudice of either party.

It follows that the decree appealed from must be reversed, and the cause remanded for further proceedings in accordance with the views expressed in this opinion.

*Decree reversed, and*
*cause remanded.*

(Decided 20th June, 1879.)

Judges ROBINSON and IRVING dissent from so much of the foregoing opinion, as decides that the books and entries of the defendants are admissible in evidence, to charge the complainants in regard to the settlement of the old firm of Sangston & Co.